## Attachment A

Had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. These facts are based upon the anticipated testimony of citizen witnesses and law enforcement agents, electronic surveillance, records obtained via grand jury subpoenas and search warrants, and physical evidence seized throughout the investigation. The information is provided for the purpose of setting forth a factual basis for the defendant's guilty plea. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

***

In 2001, CAMPION purchased Engstrom, a temporary staffing agency that was operated in Manitowoc, WI. CAMPION served as Chief Executive Officer of Engstrom and was primarily responsible for operating the business, including managing staffing, payroll, bookkeeping, and banking. During this time, Engstrom had several legitimate customers, to which the company provided temporary staffing services, including the genuine company N.E.

As is common in the temporary staffing industry, Engstrom used the services of invoice factoring companies. Invoice factoring works in the following way: a company sells its accounts receivable invoices to a factoring company at a discount, in exchange for a portion of the funds up front from the factor. The company then uses these funds to pay its employees for the work that the employees performed on behalf of the staffing company's customers. Once the customer submits full payment for the invoices directly to the factor, the factor then remits any remaining balance of the invoice, less its factoring fees, back to the company.

Engstrom began using the factoring services of Company-1 in December 2014. As part of this relationship, CAMPION submitted invoices to Company-1, and Company-1 fronted funds to Engstrom via wire transfer. From December 2014 to January 2020, CAMPION submitted several thousand such invoices in the name of its customer N.E., totaling approximately $226 million. Less than 1% of this amount can be legitimately traced to work Engstrom employees completed for N.E. during this time. The remainder of the invoices are largely fictitious.

Company-1 purchased these submitted invoices and was provided Engstrom's Bank First Account XXX2288. Company-1 advanced funds to Engstrom based on the values of these largely fictious invoices. In total, Company-1 wired approximately $199 million in funds to XXX2288, from January 2016 to January 2020.

On September 8, 2014, CAMPION opened a Bank of America Account XXX6522 in a name designed to make it appear controlled by N.E. During all relevant times, CAMPION was the sole signatory of XXX6522 and the account was 99% funded by payments coming from Engstrom's XXX2288 account. These deposited funds were quickly depleted with 99% of withdrawals being paid either to Company-1 or another N.E. account.

On February 3, 2015, CAMPION registered a company designed to resemble N.E. with the State of Wisconsin and named herself as sole principal and registered agent. On February 11, 2015, CAMPION opened a Bank of America Account XXX7135 in a name designed to make it appear as if this account was controlled by N.E. During all relevant times, CAMPION was the

14

sole signatory of XXX7135 and the account was 100% funded by deposits coming from XXX6522. These deposited funds were quickly depleted with 99% of the withdrawal funds being paid either to Company-1 or Company-2.

When it came time to pay invoices to Company-1, the wire transfers were sent from either XXX6522 or XXX7135 to Company-1 by CAMPION, who represented these funds as being from Engstrom's customer. However, the source of these funds was actually Engstrom's XXX2288 account, where Company-1 had originally deposited its funds, but the funds had then been wire transferred by CAMPION from XXX2288 to XXX6522, and often also from XXX6522 by CAMPION to XXX7135.

Company-1 eventually became suspicious of its relationship with Engstrom, leading Company-1 to question payments that appeared to be coming directly from Engstrom for invoices, rather than its customer, as expected. In response, CAMPION lied and told Company-1 that it was an error, and that the customer had accidentally sent the funds to Engstrom rather than Company-1. When Company-1 sought to verify the invoices, CAMPION created a fictitious customer employee named Christopher Engleman with phone and fax numbers associated with the Florida area code 561 (an area code which N.E. legitimately uses), to respond to these inquiries. CAMPION also submitted fictitious bank statements to Company-1 that showed Company-1's funds were used to pay Engstrom employees. In reality, these funds were used to support CAMPION's wire fraud factoring scheme by either being funneled back to Company-1 through a series of wire transfers to perpetuate the fraud or, for approximately $1.15 million of it, to personally benefit CAMPION, her family, her family's businesses, or other purchases or expenses for her and her family's benefit.

In the winter of 2019/2020, Company-1 confronted CAMPION about its suspicions, which CAMPION denied, and CAMPION began looking to find a new factor for Engstrom. In January 2020, CAMPION began communicating with Company-2, and Engstrom entered into a new factoring relationship with Company-2. As part of this process, CAMPION created and submitted fictitious bank statements, invoice verifications, and other financial records to Company-2 for both Engstrom and the fictitious customer. As part of this new relationship with Engstrom, Company-2 purchased approximately $10 million of Engstrom's largely fictitious invoices from Company-1. By mid-February 2020, Company-2 became suspicious of fraud after receiving a payment from account XXX7135 and discovering this account belonged to the company formed by CAMPION. Company-2 eventually confronted CAMPION about the scheme.

CAMPION's scheme resulted in the following financial losses: $5,000,000 to Company-1 and $5,389,371.51 to Company-2.

### *Count One: November 2019 Transaction*

On or about November 25, 2019, CAMPION wire transferred $431,500 from XXX6522 to XXX7135, accounts to which she was the sole signatory. This money in XXX7135 then funded three wire transfers CAMPION sent on or about that same day to Company-1 in the amounts of $101,646, $112,111, and $130,578. These wire transfers were represented, by CAMPION, as payments from N.E. for invoices owed as a customer of Engstrom.

15

The funds CAMPION transferred from XXX6522 to XXX7135 are proceeds of CAMPION's wire fraud factoring scheme. On or about November 25, 2019, Company-1 wire transferred $521,260 to XXX2288, another account in which CAMPION was the sole signatory on, to front payment for invoices Engstrom had submitted. At least 78% of this amount is linked to fraudulent invoices. Prior to receiving this wire transfer, the balance of XXX2288 was $38,136.26. After receiving Company-1's wire, on about that same day, CAMPION sent two wire transfers from XXX2288 to XXX6522 in the amounts of $100,500 and $411,000. Prior to receiving these wire transfers, the balance of XXX6522 was $2,252.01.

Therefore, the vast majority of the funds wired from XXX7135 to Company-1 are the direct result of funds Company-1 sent to Engstrom because of CAMPION's fraudulent invoices submitted for payment. CAMPION disguised the nature, location, source, ownership, and control of these funds through a series of wire transfers on accounts she solely controlled with knowledge that this disguise's purpose was to misrepresent that the payment made to Company-1 was from N.E.. At the time of these transactions, CAMPION knew the funds involved were at least in part proceeds from her earlier wire fraud in violation of 18 U.S.C. § 1343.

### *Count Two: February 2020 Transaction*

On or about February 11, 2020, CAMPION transferred $337,000 from XXX6522 to XXX7135, accounts to which she was the sole signatory. This money in XXX7135 then funded three wire transfers CAMPION sent on or about that same day to Company-2 in the amounts of $95,792, $118,642, and $122,434. These wire transfers were represented as payments from N.E. for invoices owed as a customer of Engstrom.

The funds CAMPION transferred from XXX6522 to XXX7135 were proceeds of CAMPION's wire fraud factoring scheme. On or about February 11, 2020, Company-2 wire transferred $521,709.61 to XXX2288, another account in which CAMPION was the sole signatory on, to front payment for invoices Engstrom had submitted. At least 98% of this amount is linked to fraudulent invoices. Prior to receiving this wire transfer, the balance of XXX2288 was $50,540.34. After receiving Company-2's wire, on about that same day, CAMPION sent a wire transfer from XXX2288 to XXX6522 in the amount of $337,000. Prior to receiving these wire transfers, the balance of XXX6522 was $5,935.37.

Therefore, the vast majority of the funds wired from XXX7135 to Millennium are the direct result of funds Millennium sent to Engstrom because of CAMPION's fraudulent invoices submitted for payment. CAMPION disguised the nature, location, source, ownership, and control of these funds through a series of wire transfers on accounts she solely controlled to misrepresent that the payment made to Company-2 was from N.E. At the time of these transactions, CAMPION knew the funds involved were at least in part proceeds from her earlier wire fraud in violation of 18 U.S.C. § 1343.